United States District Court
Southern District of Texas
**ENTERED**
February 25, 2016
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES EDWARD BARLEY, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-15-1529 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| *Respondent.* | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner, a state inmate proceeding *pro se*, filed this section 2254 habeas petition challenging his conviction and fifty-year sentence for murder.  Respondent filed a motion to dismiss (Docket Entry No. 8), to which petitioner filed a response  (Docket Entry No. 13).[1]

Based on careful consideration of the pleadings, the record, the motion and response, and the applicable law, the Court GRANTS the motion to dismiss and dismisses this lawsuit for the reasons below.

---

[1]Petitioner did not sign his response and it was not made under penalty of perjury.  To the extent petitioner attached exhibits and other documents, they are unsworn copies that do not constitute probative evidence.  Regardless, this Court cannot consider documents or exhibits that were not presented to the state court and that were not utilized by the state court in reaching its determination.  In *Cullen v. Pinholster*, ___ U.S. ____, 131 S. Ct. 1388, 1398  (2011), the Supreme Court held that habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits."  A petitioner cannot, on federal habeas review, present evidence which he did not present to the state court that ruled on the merits.

### *Background and Claims*

The jury found petitioner guilty of the felony murder of his wife.  After finding two enhancement paragraphs true, the trial court sentenced petitioner to fifty years' incarceration.  The conviction was affirmed on appeal in an unpublished opinion, *Barley v. State*, No. 01-12-01002-CR (Tex. App. – Houston [1st Dist.] 2013, no pet.), and no petition for discretionary review was filed.  Petitioner's application for state habeas relief, filed with the state trial court in December 2014, was denied by the Texas Court of Criminal Appeals in April 2015.

In the instant federal habeas petition, petitioner raises claims for ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and trial court error.  Respondent contends that the claims are without merit and should be summarily dismissed.

### *Factual Background*

In its opinion affirming petitioner's conviction on direct appeal, the intermediate state court of appeals set forth the following statement of facts:

> Charles Edward Barley lived with his wife, Donna Jackson, in Brookshire, Texas. One pre-dawn morning, Donna's son, Brandon Jackson-Blair, returned home after spending the night at his cousin's house. He walked in, noticed the back door was open, found his mother unresponsive in her bed, and called the police. Brookshire Officer Ryland responded to the call and confirmed that Donna was dead.  She had scratches on her back and arm and blood coming from her nose.  Officer Ryland found a machete near the bed but no other weapons.  There was no blood on the machete.  Lieutenant Garcia assisted with the investigation.  As part of their investigation, the police sought to question Barley but could not locate him.  Dr. Morna Gonsoulin performed an autopsy on Donna but was unable to identify signs of injury.

2

Three days after Donna died, Lieutenant Garcia received a call that Barley had turned himself in at the Houston Police Department.  Barley agreed to be transported back to Brookshire where he was read his rights and voluntarily gave a recorded statement.  Barley was not in custody at the time of the interview.

Throughout the interview Barley was adamant that Donna attacked him.  He claimed she accused him of infidelity, became enraged, and chased him around the house with a machete.  He repeatedly admitted that he grabbed her around the neck, squeezed "with all his might" and pushed her to the bedroom.  There, the two fell to the floor.  Though Donna no longer had the machete, Barley straddled her on the floor and continued choking her.  He estimated that he choked her for an additional one to two minutes after she dropped the machete, during which time she did nothing because "there wasn't anything she could do."  Once she was unconscious, he lifted her to the bed, put covers on her, then grabbed her car keys and left.

The police repeatedly asked Barley why he did not call them or an ambulance to check on Donna once he left the house and was out of danger.  Barley very agitatedly answered, "Hell no.  She attacked me."  When pressed that she could have used the help he stated, "I don't care.  The aggression—she brought it out of me.  I wasn't calling anyone to come check on her."  And again later:  "I don't give a f— about her because she was trying to do harm to me.  She tried to hurt me."

Barley also was asked many times why he did not stop choking her once she dropped the machete and was no longer an immediate threat to him.  Each time Barley refused to answer the question.  Finally, he offered this explanation: "I don't let nobody hurt me.  I'm going to try to avoid you.  But if you don't stop [inaudible] get out of hand [inaudible] I'm going to stop you.  I don't care who it is.  If you push me to the point of no return, there it is."

Barley claimed to not have realized Donna was dead.  He says he went to Houston, eventually calling his aunt to see if Donna had called her looking for him.  When the aunt said she had not, he called his cousin who told him she was dead.  He then called both the Brookshire Police Department and the Houston Police Department to see if there was a warrant for his arrest.  During this time, Barley was using Donna's debit card to pay for hotel rooms in

Houston, after hiding her car in a parking garage on Westheimer.  When he eventually went to the police, Donna's account had been completely depleted.

In addition to Barley's explanation of how he choked Donna and left for Houston, Barley also made a couple of references to his criminal past during the interview.  He told the police that his depression and emotional issues had been diagnosed in "TDC" and, in a later portion of the tape, that he could not have guns, presumably as a result of a prior conviction.  Another statement referenced prison directly.  The police asked him why he called asking if there was a warrant for his arrest.  He answered:

| | | |
|---|---|---|
| Barley: | "I've been to prison how many times?" | |
| Police: | "I don't know.  You tell me." | |
| Barley: | "Three times.  You ask if there is a warrant for your arrest anytime there's [anything] questionable." | |

At no point did Barley elaborate on the past convictions.  He never said what crimes had been committed or how long he was confined.  The interviewing officers did not ask for more detail.

A more in-depth analysis was performed on the autopsy specimens after the police received this information from Barley.  Dr. Sharon Derrick, a forensic anthropologist with the medical examiner's office, who has specialized training evaluating bone trauma, was asked by Dr. Gonsoulin to analyze the specimens.  She found fractures to the hyoid bone and cricoid cartilage in Donna's neck.  She explained, "Anytime the hyoid is fractured, it is a suspicious occurrence."  These injuries, in her opinion, were consistent with "forceful compression of the neck."

Based on Dr. Gonsoulin's findings and Barley's statement, Barley was tried for murder.  The jury charge included the offense of murder as well as the lesser included offenses of manslaughter, criminally negligent homicide, aggravated assault, and deadly conduct.  The charge also instructed the jury on the use of deadly force in self-defense.  Barley did not testify in person at his trial, though the entire audiotape of his police interview was played for the jury.

Based on all the evidence presented, the jury found Barley guilty of murder. Barley elected to have the judge determine punishment. Barley's past criminal record caused him to be sentenced as a habitual offender with an applicable punishment range of 25 to 99 years. The trial court sentenced him to 50 years in prison.

*Barley*, slip op. at 2–6.

### *Legal Standards*

*Habeas Review*

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U .S.C. § 2254. Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or

unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409.  In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable.  *Id*. at 411.  "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Richter*, 562 U.S. at 102.  As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.*, at 102–03 (emphasis added; internal citations omitted).

The AEDPA affords deference to a state court's resolution of factual issues.  Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding.  *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003).  A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.

6

*Summary Judgment*

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### *Ineffective Assistance of Trial Counsel*

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI. A federal

7

habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id*. at 687. The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. In determining whether counsel's performance was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996). To overcome this presumption, a petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id*. at 694. To determine prejudice, the question focuses on whether counsel's deficient

performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  In that regard, unreliability or unfairness does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled.  *Id*.

Petitioner raises numerous complaints against trial counsel, which are grouped for clarity and efficacy, as follows.

*Self-Defense/Trial Issues*

It is undisputed that the key issue surrounding the trial in this case was whether petitioner's intent had been to commit murder or merely defend himself.  Petitioner argues that trial counsel failed to present available evidence to support the theory of self-defense and that he abandoned the theory at trial.

The state court record plainly refutes petitioner's argument.  Petitioner's recorded statement to the police contained his statements of self-defense, and was admitted into evidence.  Moreover, a substantial portion of counsel's closing argument was dedicated to discussing petitioner's actions taken against complainant in self-defense and in reviewing complainant's history of violence.  15 R.R. 43–52.  Petitioner fails to present probative summary judgment evidence of any available self-defense evidence counsel neglected to use at trial, and his conclusory allegations are insufficient to raise a genuine issue of material fact precluding summary judgment.  *See Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

9

Petitioner likewise fails to support his assertion that counsel should have called an expert witness to testify as to petitioner's and complainant's states of mind during the incident.  Such evidence, petitioner argues, would have allowed the jury to see that complainant wanted to injure him and that he attacked her in self-defense.  However, the law is clear that, "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  Petitioner does not meet this burden of proof, and habeas relief is unwarranted.

Petitioner also contends that counsel failed to articulate to the jury that the State failed to prove its case beyond a reasonable doubt.  The Court has reviewed the trial record, particularly arguments of counsel, and finds no support for petitioner's bald, conclusory assertion.  Moreover, the trial court clearly and correctly charged and instructed the jury as to which parties carried the burden of proof as to the elements of murder and self-defense.  Petitioner merits no relief on this claim.

In further bare, unsupported fashion, petitioner complains that trial counsel should have made a *Daubert* objection[2] to the testimony of the assistant medical examiner, Dr. Morna Gonsoulin, and the forensic anthropologist, Dr. Sharon Derrick.  However, petitioner

---

[2]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

10

sets forth no basis upon which such an objection should have been made, let alone shown that such an objection would have been granted.  A review of the testimony of these two witnesses evinces no objective basis for making a credible *Daubert* objection.  Petitioner fails to establish deficient performance and prejudice under *Strickland*, and habeas relief is unwarranted.

Petitioner next contends that counsel failed to determine that a particular gang member, Jonathan Chavez, had been in complainant's backyard on the evening of the criminal offense; failed to investigate and present evidence that a drive-by shooting occurred at or near complainant's house a day before the incident; and failed to investigate whether complainant may have heard gunfire at her house.  Petitioner speculates that perhaps these incidents, as opposed to being choked by petitioner, would explain her death in light of her medical conditions.  To quote petitioner's own words: "Could the sound of a gun, and/or gangs running around her home frightened her to death?"  (Docket Entry No. 13, p. 27.) Petitioner complains that trial counsel failed to explore these possible avenues, and failed to investigate whether Chavez strangled complainant or had important information.

Petitioner's arguments are hypothetical conjecture that fail to warrant federal habeas relief.  The jury was provided with evidence that there may have been a drive-by shooting near complainant's house a day earlier, and that Chavez had been in complainant's backyard at some point.  The jury also heard from a medical witness that complainant died from strangulation, and that petitioner had admitted to choking her until she lost consciousness.

11

Moreover, petitioner sets forth nothing more than speculation and conjecture as to what counsel may or may not have investigated regarding Chavez or alternative causes of death, or as to what may or may not have been fruitful defense arguments. Petitioner falls well short of his burden to show deficient performance or that, but for counsel's purported deficiency, there is a reasonable probability that the result of the trial would have been different.

Petitioner also contends that trial counsel failed to narrow down the time of death or to call Cynthia Thomas to testify as to a precise time of death. However, given that petitioner admitted to choking complainant until she passed out, and that the cause of complainant's death was found to be strangulation, he fails to show how narrowing her time of death would have benefitted his self-defense theory. Nor does petitioner establish under *Day* that Cynthia Thomas or any other witness had been available to testify and that the witness would have established a narrower time of death. Petitioner demonstrates neither deficient performance nor actual prejudice under *Strickland*.

Petitioner further argues that counsel failed to present evidence of his gainful employment during the marriage. At trial, complainant's son testified that petitioner had been unemployed and took financial advantage of complainant during their marriage. Another witness testified that, shortly before the incident, petitioner and complainant had been fighting over petitioner's demand for money. However, to any extent petitioner may have been gainfully employed during that time, he fails to show that he informed counsel of

employment that was not introduced at trial.  Petitioner further fails to establish that, but for counsel's failure to use the available evidence, there is a reasonable probability that the result of the trial would have been different.  Again, petitioner demonstrates neither deficient performance nor prejudice under *Strickland*.

Petitioner states that trial counsel requested funding for an expert medical forensics witness and that the trial court appointed Dr. Lee Ann Grossberg, M.D.  Petitioner complains that trial counsel then failed to call the expert witness at trial.  Petitioner's conclusory and speculative assertions that Grossberg's testimony would have benefitted the defense are unsupported by any evidence in the record and provide no basis for federal habeas relief. Moreover, the jury was presented with evidence that some of the damage to complainant's surrounding throat tissue had been caused by the autopsy, but that the primary fatal damage was due to manual strangulation.  That Grossberg might have testified to the existence of autopsy-related damage would have been cumulative of existing, undisputed evidence and testimony.  Petitioner shows neither deficient performance nor prejudice under *Strickland*.

*Omitted Records*

Petitioner also complains that trial counsel should have obtained complainant's medical and mental health records to prove her history of domestic violence.  However, the trial record shows that at least two men testified at trial as to complainant's prior violence against them, and her history of violent episodes was not disputed.  Petitioner's recorded police statement was also presented to the jury, in which he discussed complainant's violent

episodes, including the incident involved here.  Assuming records of other incidents would have been allowed into evidence, petitioner fails to establish that, but for counsel's failure to obtain and present complainant's medical and mental health records, there is a reasonable probability that the result of the trial would have been different.

Petitioner contends that counsel was not prepared to counter the State's medical evidence regarding the cause of death.  He also proposes that complainant broke her neck in a prior accident, and that this was somehow related to the autopsy findings of a broken hyoid bone.  However, as previously noted by the Court, petitioner acknowledged that he choked complainant until she stopped responding, then drove away without summoning help for her.  The State's medical witness testified that complainant died from strangulation as evidenced by her broken hyoid bone in her throat, and the jury was informed that other, minor damage to her surrounding throat tissue was caused by the autopsy itself.  Nothing in the record supports petitioner's speculation that a previously broken neck vertebra and the current broken hyoid bone were the same or related injuries.  Petitioner presents only speculation and conjecture as to how counsel could have countered the State's medical evidence, and his unsupported assertions provide no basis for federal habeas relief in this case.

Petitioner next contends that trial counsel failed to obtain his 911 telephone records in an effort to show that he was a "battered spouse."  This argument, as with petitioner's other arguments, is conclusory, speculative, and unsupported in the record.  Petitioner fails to show that his 911 records would have supported a "battered spouse" defense or benefitted

14

his claim of self-defense. Petitioner establishes neither deficient performance nor actual prejudice under *Strickland*, and federal habeas relief is unwarranted.

Petitioner also complains that trial counsel failed to obtain complainant's military records. Petitioner does not articulate clearly how such records would have benefitted the defense, but he apparently believes that they would have provided further evidence of complainant's prior medical and mental health issues, including her violent tendencies. Again, it was not disputed that complainant had a history of violent outbursts. Indeed, one of her ex-husbands testified that complainant had been violent at times, but he admitted that he had incited her outbursts. Nor does petitioner discount the possible scenario that counsel did investigate the records but determined they were unhelpful. Petitioner fails to establish that, but for trial counsel's purported failure to obtain complainant's military records, there is a reasonable probability that the result of the trial would have been different. Petitioner establishes neither deficient performance nor actual prejudice under *Strickland*, and federal habeas relief is unwarranted.

### Omitted Expert/Medical Witnesses

Petitioner next claims that trial counsel was ineffective in failing to call Dr. D'Angelo, Dr. Al Jurdi, and other unnamed mental health experts who would have testified regarding complainant's violent behavior and mental health. Petitioner fails to show that counsel did not investigate these witnesses and reasonably determine that they would be unhelpful. A petitioner seeking to prove ineffective assistance must overcome the presumption that, under

the circumstances, the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689.  Regardless, nothing in the record establishes that these witnesses would have testified at trial or what additional defense evidence they would have provided, and petitioner fails to meet his burden of proof under *Day* as to his claims of omitted witnesses. Federal habeas relief is not merited on these claims.

*Omitted Lay Witnesses*

Petitioner alleges that trial counsel was ineffective in not calling Officer Miller to testify to a prior "standoff" between petitioner and complainant.  Petitioner again fails to show that counsel did not investigate Officer Miller and reasonably determine that the testimony would be unhelpful.  Regardless, nothing in the record establishes how Officer Miller would have testified at trial or that he would have testified, and petitioner fails to meet his burden of proof under *Day* as to this claim.  No ineffective assistance of counsel is shown.

Petitioner also contends that trial counsel failed to call Mary Alice Conroy, a court-appointed forensic psychologist who found petitioner competent to stand trial.  However, petitioner fails to show that counsel did not investigate this witness and reasonably determine that her testimony would be unhelpful if not harmful.  Regardless, nothing in the record establishes Conroy's anticipated testimony or shows that she would have testified, and petitioner fails to meet his burden of proof under *Day*.  Ineffective assistance is not shown.

16

Petitioner next argues that trial counsel should have interviewed and called unnamed defense witnesses who could have rebutted some of the State's evidence.  Again, petitioner does not show that counsel did not investigate these witnesses and reasonably determine that their testimony would be unhelpful.  Regardless, nothing in the record identifies these various unnamed individuals or establishes how they would have testified at trial or that they would have testified at trial, and petitioner fails to meet his burden of proof under *Day*.  Petitioner demonstrates neither deficient performance nor actual prejudice with these speculative, unsupported claims.

Petitioner further argues that trial counsel failed to call an unnamed police officer who could have testified to an additional confrontation between complainant and her prior husband.  However, petitioner does not establish that the officer would have testified at trial nor does he present evidence of his anticipated testimony.  Moreover, petitioner fails to show that trial counsel did not investigate the incident and the witness and determine that the evidence would not have benefitted the defense.  The trial record shows that complainant's ex-husband testified to one especially violent confrontation with complainant that resulted in her cutting him.  Petitioner fails to demonstrate that, but for trial counsel's failure or decision to not present evidence of another confrontation, there is a reasonable probability that the result of the trial would have been different.  Habeas relief is not warranted on this claim.

Petitioner next argues that trial counsel failed to investigate material witnesses. Petitioner does not identify these alleged individuals, much less present evidence of their availability for trial or their anticipated testimony. Nor does petitioner establish that, but for counsel's failure to investigate or call these witnesses, there is a reasonable probability that the result of the trial would have been different.

To the extent petitioner complains that his recorded police statement was prejudicial to the defense, his complaint does not establish ineffective assistance of counsel. Petitioner argues that in the statement, he said he had been to state prison three times. Trial counsel objected to that portion of the statement, but the trial court found that petitioner had volunteered the information and overruled the objection. 13 R.R. 155–59. To any extent petitioner now challenges other portions of his recorded statement, he fails to show that counsel's objection would have been granted and that, but for counsel's failure to object, there is a reasonable probability that the result of the trial would have been different. Federal habeas relief is unwarranted.

Petitioner contends that trial counsel should have objected to Dr. Derrick's testimony that Dr. Gonsoulin told her that she may have fractured one of the victim's neck bones during the autopsy. Petitioner fails to establish that such an objection would have been granted if made or that, but for counsel's failure to object, there is a reasonable probability that the result of the trial would have been different. Moreover, the alleged testimony arguably

18

benefitted the defense, and petitioner fails to overcome the presumption that it was reasonable trial strategy for counsel not to object.

Petitioner also appears to argue that trial counsel should have called Monique Smith as a defense witness, an individual with whom petitioner states he was "in a committed relationship." Petitioner states that Smith corresponded with trial counsel and bonded petitioner out of jail, and could provide "insight" into the case from March 2011 forward. Nothing in the state court record shows that Smith was available and willing to testify at trial, nor does petitioner establish any specifics of her anticipated testimony or show that her "insight" would have been admissible or beneficial. Moreover, the record shows that during the guilt-innocence phase of trial, defense witness LaRee Morris testified that she and petitioner were currently living together and were engaged to be married. 15 R.R. 30. Petitioner fails to establish that trial counsel did not investigate Smith as a potential witness and reasonably determine that her testimony would not be helpful and could possibly be harmful. Deficient performance and actual prejudice are not shown, and federal habeas relief is unwarranted.

*Jury Issues*

Petitioner claims that trial counsel was ineffective in failing to challenge unnamed jurors for cause. He does not identify the jurors or establish a basis for a viable challenge for cause. Petitioner's conclusory and speculative allegations are not supported in the record and provide no basis for federal habeas relief.

19

Petitioner also complains that the trial court granted trial counsel's request for a jury shuffle, but that counsel then failed to request a second jury shuffle. Petitioner does not show that he was entitled to a second jury shuffle as a matter of right, or that the trial court would have granted a request for a second jury shuffle. Regardless, petitioner fails to establish that, but for counsel's failure to request a second jury shuffle, there is a reasonable probability that the result of the trial would have been different. Deficient performance and actual prejudice are not shown, and habeas relief is unwarranted.

In like manner, petitioner states, without presenting any factual basis in the record, that he was found guilty by an all white jury. He apparently argues that trial counsel should have challenged the venire panel under *Swain v. Alabama*, 380 U.S. 202, 205 (1965). *See also Batson v. Kentucky*, 476 U.S. 79 (1986). An extensive analysis of the factors required under these cases is not necessary for the Court's disposition of this claim, as the record fails to establish even the most basic of petitioner's allegations – that he was convicted by an all white jury. The record before this Court does not reflect the racial demographics of the panel or the sitting jurors, or of the individuals preemptively struck by the State. Ineffective assistance of counsel cannot be based on petitioner's conclusory allegations unsupported in the record. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) ("Although *pro se* habeas petitions must be construed liberally, mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue."). Petitioner demonstrates neither deficient performance nor actual prejudice under *Strickland*.

20

As to all of these above arguments, petitioner fails to meet his burden of proof under *Strickland* to show deficient performance and actual prejudice; that is, petitioner fails to show that, but for counsel's alleged act or failure to act, there is a reasonable probability that the result of the trial would have been different. The state court denied relief on these arguments and issues. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. No basis for habeas relief is shown, and respondent is entitled to summary judgment on the issue of ineffective assistance of trial counsel.

### *Prosecutorial Misconduct*

Petitioner claims that the prosecutor made numerous references to facts he knew were untrue, or deliberately ignored certain evidence in an effort to gain unfair favor with the jury. Specifically, petitioner complains that the State knew that complainant had a history of violence and had been arrested on at least one occasion. However, the state trial record shows that this information was presented to the jury. To the extent petitioner claims there were other instances of complainant's violence that were not used at trial, petitioner fails to show that the State was under a duty to present to the jury evidence of all episodes of her prior violence. The State never denied that complainant had a history of violent episodes, nor did the State suggest that the jury had been given evidence of all instances of her violent behavior. Moreover, petitioner does not argue that the State withheld this information from

21

the defense; indeed, one of petitioner's complaints against trial counsel is that counsel failed to present evidence of all prior instances of complainant's violence. No prosecutorial misconduct is shown.

Petitioner also alleges the State knew that complainant and her ex-husband had remarried each other one or more times. However, the record does not show that the State told the jury they had not remarried, or that the State was under a duty to inform the jury of all prior remarriages between complainant and her ex-husband. Moreover, petitioner does not contend that the State suppressed or otherwise withheld this information from the defense. No prosecutorial misconduct is shown.

Petitioner next contends that the State misrepresented him to the jury as an unemployed crack cocaine user. Petitioner fails to show that this was an unreasonable deduction in light of the evidence presented at trial. The state court record is devoid of evidence establishing petitioner as gainfully employed throughout his marriage to complainant. At trial, complainant's daughter testified that petitioner did not have regular employment, and that complainant received monthly retirement and disability checks. 14 R.R. 101–02. Witnesses testified that, shortly before the instant offense, complainant and petitioner had fought over his demand for money from her, and that petitioner had been seen walking through the neighborhood apparently looking to buy drugs. Complainant's son also testified to seeing petitioner using crack cocaine on numerous occasions. Moreover, petitioner admitted in his recorded statement that he used crack cocaine, but had not used any

"that day."   The State's reference to him as an unemployed crack cocaine user was a reasonable deduction from the evidence.   That petitioner did not accept the State's description of him, or that he disliked how it made him look to the jury, does not constitute grounds for prosecutorial misconduct.

Petitioner also disagrees with the State's representation that he had fled the scene of the offense by taking complainant's vehicle.   However, the state court record shows that petitioner was in possession of complainant's vehicle after the incident, and had informed police authorities of its location.   That he disputes the reasonable deductions drawn by the State from those facts does not establish prosecutorial misconduct.

Petitioner next alleges that the State goaded witnesses into giving false testimony.   It is long settled law that the prosecution may not knowingly use perjured testimony or allow perjured testimony to go uncorrected.   *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150, 154 (1972).   To prove a due process violation through the State's use of perjury, a petitioner must demonstrate (1) that the testimony in question was actually false, (2) that the prosecutor was aware of the falseness, and (3) that the testimony was material.   *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996).   Perjured testimony is material only when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."   *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000); *see also United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995) (holding that the materiality prong is not met where allegedly perjured statements were unrelated to

defendant's guilt or innocence and the evidence of guilt was otherwise overwhelming).

Moreover, contradictory testimony from witnesses, inconsistencies within a witness's

testimony, and conflicts between reports, written statements and the trial testimony of

prosecution witnesses do not, standing alone, establish perjury.  *Koch v. Puckett*, 907 F.2d

524, 531 (5th Cir. 1990).  Petitioner's disagreement with testimony given by witnesses does

not establish that the witnesses were goaded by the State or that the testimony constituted

perjury.  No prosecutorial misconduct is shown.

Petitioner additionally complains that the State erroneously agreed that lesser included

offense instructions should be included in the charge.  Any factual or legal basis for

petitioner's argument does not appear in the record.  If he is challenging the propriety of the

jury instructions, he cannot pursue such challenge here through a prosecutorial misconduct

claim.  It is rank speculation by petitioner that the State agreed to jury instructions knowing

they were erroneous under the law.  Moreover, he cannot show harm at this point, as the jury

did not find him guilty of a lesser included offense.  Petitioner's claim of prosecutorial

misconduct is unsubstantiated in the record.

Petitioner further alludes to several generic remarks made by the State during closing

argument as being improper, none of which merits individual analysis here.  Proper jury

argument includes: (1) summations of the evidence, (2) reasonable deductions from the

evidence, (3) responses to an opponent's argument, and (4) pleas for law enforcement.

*Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008).  The Court has considered

petitioner's generalized arguments and finds that the complained-of comments were not improper under the facts of this case.  That petitioner disagrees with the State's comments does not establish improper jury argument or prosecutorial misconduct.

The state court denied habeas relief.  Petitioner does not show that the adjudication of his prosecutorial misconduct claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  See 28 U.S.C. § 2254(d)(1).  Habeas relief is not warranted on petitioner's claims.

### Insufficiency of the Evidence

Petitioner claims that the trial court erred in denying his motion for a directed verdict. Under Texas state law, alleged errors regarding the denial of a motion for a directed verdict are construed as a challenge to the legal sufficiency of the evidence.  *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).  Petitioner raised this claim on state collateral review, but not on direct appeal.  In Texas, claims challenging the sufficiency of the evidence can only be raised on direct appeal, not on state habeas review.  *Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004) (holding that sufficiency of the evidence claims are not cognizable on state habeas review).  Consequently, this claim is procedurally barred and cannot form the basis for the granting of federal habeas relief by this Court.

Regardless, the Court has reviewed the state court record and finds the evidence sufficient under federal standards.  Evidence is sufficient to support a conviction under

federal standards whenever, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The offense of murder is defined under Texas Penal Code § 19.02(b)(2) as follows: "A person commits an offense if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual[.]" The statement of facts set forth by the intermediate court of appeals provides an adequate and thorough synopsis of the relevant evidence proffered at trial, and establishes that there is sufficient evidence under *Jackson* to support the jury's verdict of murder. In the interest of justice, this Court has independently reviewed the state court record and finds the evidence sufficient under *Jackson* to support petitioner's murder conviction. Habeas relief is not warranted.

### *Trial Court Error*

Under his claim of trial court error, petitioner re-urges the sole issue he raised on direct appeal – that the trial court erred in admitting into evidence that portion of his recorded statement regarding his prior incarcerations. The intermediate appellate court explained the context and content of the disputed evidence as follows:

> In addition to Barley's explanation of how he choked Donna and left for Houston, Barley also made a couple of references to his criminal past during the interview. He told the police that his depression and emotional issues had been diagnosed in "TDC" and, in a later portion of the tape, that he could not have guns, presumably as a result of a prior conviction. Another statement referenced prison directly. The police asked him why he called asking if there was a warrant for his arrest. He answered:

> Barley:     "I've been to prison how many times?"
>
> Police:     "I don't know.  You tell me."
>
> Barley:     "Three times.  You ask if there is a warrant for your arrest anytime there's [anything] questionable."

At no point did Barley elaborate on the past convictions.  He never said what crimes had been committed or how long he was confined.  The interviewing officers did not ask for more detail.

*Barley*, slip op. at 4–5.

At trial, defense counsel objected to those portions of the statement that mentioned petitioner's prior criminal history.  The trial court overruled the objection, finding that petitioner had volunteered the information without inquiry or follow-up by the police officers.

On direct appeal, petitioner argued that the trial court had erred in allowing the disputed portions of the statement into evidence.  The First Court of Appeals in Houston agreed with petitioner, and found that the disputed portions were inadmissible under state rules of evidence.  However, the appellate court continued its analysis and determined that the error was harmless:

> An erroneous evidentiary ruling will cause a reversal of conviction only if the error affected the defendant's substantial rights.  We must consider whether Barley's references to his prior convictions, in light of all the other evidence before the jury, had a substantial effect on the jury's determination.  Because we find the error had, at most, a slight effect, it was harmless and does not require reversal.

27

1.      Standard of review

Evidentiary errors are non-constitutional and require reversal only if they affected the complaining defendant's substantial rights.  The error must have a "substantial and injurious effect or influence" on the jury's verdict.  A substantial right is not affected if the reviewing court has a "fair assurance that the error did not influence the jury, or had but a slight effect."  In other words, if there is a "grave doubt" that the result was free from the substantial influence of the evidence, then the defendant's substantial rights were affected.  "Grave doubt" means "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."

When analyzing the likelihood that a jury's decision was affected by erroneously admitted evidence, we consider everything in the record, including the testimony and physical evidence admitted, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with the other evidence, the jury instructions, the State's and defendant's theories of the case, and closing arguments.  It also is relevant whether the State emphasized the error in closing argument or otherwise.  Lastly, the presence of overwhelming evidence supporting a finding of guilt is a legitimate factor in evaluating the harm the error caused.

2.      Applying the factors to the record

Barley argues that information about his past convictions could have substantially affected the jury's decision to find him guilty of murder instead of either accepting his self-defense argument or choosing a lesser-included offense, such as criminally negligent homicide.  In light of this claim, we review the entire record and apply the [relevant] factors to determine what effect the erroneously admitted statements may have had on the jury's determination of guilt.

a.      Theories of the case

The first factor we consider is the State's and defendant's theories of the case.  The State argued Barley committed the offense of murder, which—as described in the jury charge—required that Barley "intend[ed] to cause serious bodily injury and commit[ted] an act clearly dangerous to human life that cause[d] the death of an individual."

Barley's theory was self-defense. The jury charge included an instruction on the law of self-defense, explaining that a person can be justified in using deadly force "when and to the degree he reasonably believes deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force." The jury was told to consider "all relevant facts and circumstances surrounding the killing [including] the previous relationship existing between the accused and the deceased . . . [and] the condition of the mind of the defendant at the time of the offense."

In the interview, Barley never explained why he did not stop choking Donna once she was no longer an immediate threat, even though the interviewing officers asked him repeatedly. Often he refused to answer the question. Only at the end of the interview did he finally say, "I don't let nobody hurt me. I'm going to try to avoid you. But if you don't stop [inaudible] get out of hand [inaudible] I'm going to stop you. I don't care who it is. If you push me to the point of no return, there it is." After admitting he choked her for one to two minutes after she dropped the machete, he said, "I was pissed. I've got a button. If you push it the wrong way, I am going to respond. I can't help it. I'm not going to let anyone push me the wrong way."

The competing theories required the jury to consider the facts surrounding Donna's death and Barley's state of mind at the time he killed her. The challenged evidence did not directly relate to the parties' theories or the issues before the jury. Accordingly, this factor favors a finding of harmless error.

b.    Evidence of guilt

A jury may consider a defendant's attitude during his police interview when assessing guilt. Further, an intention to commit murder reasonably can be inferred when a defendant is hostile and shows no empathy or remorse during his police interview. Overwhelming evidence of guilt will favor a finding of harmless error.

In [one case], evidence was erroneously admitted during a murder trial. The Court of Criminal Appeals held that it was appropriate to examine the evidence of the defendant's guilt as one factor in its substantial harm analysis. The court held that the defendant's demonstration of "contempt, defiance, and apathy during the interview rather than remorse" could be considered by the jury as evidence that he did not regret his crime, and even as evidence that he intended to commit the murder.

Ranger Luna testified about Barley's hostility during the interview. Barley "seemed to get upset when we talked to him and leaned forward and I thought there might be some altercation during the interview." The police asked him repeatedly why he did not call them or emergency services to aid Donna after he left, if he really believed she was still alive. Barley was very defiant, showing no remorse in his responses, often saying, "Hell, no . . . she was trying to hurt me" also "I don't care! The aggression—she brought it out of me. I wasn't calling anyone to come check on her."

His demeanor was the same when asked why he continued choking her once she dropped the machete. He repeatedly said he "did not care" if she was fighting back or not after she dropped the machete. He reasoned that it did not matter because she was the one who attacked him: "I was pissed! I've got a button. If you push it the wrong way, I am going to respond." Again, "I don't care who it is. If you push me to the point of no return, there it is."

When asked what she was doing as he choked her, he responded: "She wasn't doing [anything] because there wasn't anything she could do." He continued, "What do I care? . . . I don't care. She attacked me, chasing me with a machete. That set everything in motion. I was in a rage. I'm not going to let anyone push me . . . I don't give a f— about her because she was trying to do harm to me. She was trying to hurt me." Later he said he "hasn't shed a tear" and does not know why, explaining that it is like he has a "blockade" and is not "processing" what happened.

A reasonable jury could interpret Barley's hostility in the interview, apathy, and lack of remorse as evidence of intent or, at a minimum, as evidence Barley realized the immediate danger had passed yet continued using deadly force against Donna. Furthermore, the jury could infer guilt from the fact that Barley fled, hid Donna's car, then hid in Houston for several days after he choked her.

Likewise, the inconsistencies between Barley's statements in the interview and those of the other trial witnesses could affect Barley's credibility with the jury. Donna's son, Brandon Jackson-Blair, testified that, when he left the house the night before her death, Barley and his mother were arguing because Barley had been drinking earlier in the day and "wanted some money." Jackson-Blair testified that Barley appeared to be under the influence of alcohol or drugs, that he had previously seen Barley in that condition, and that he had seen him smoke crack cocaine many times. Jackson-Blair had seen him smoking crack

cocaine and drinking shortly before the argument and knew Barley had been in the neighborhood looking for crack cocaine earlier that day. Barley admitted in his statement that he was drinking on the day of the fight and that he was a frequent user of crack cocaine; however, he denied using drugs that day.

Officer Ryland testified that he did not find any additional machetes or other weapons at the house. In contrast, Barley's self-defense claim was based in part on his assertion that there were multiple machetes in the home and Donna could have picked up another one had he stopped choking her. Further, Donna had scratches on her back and arm and blood coming from her nose. Yet Barley said in the interview that he did not scratch Donna or hit her.

Donna's daughter, Nasha Jackson, testified that Barley did not contribute financially to his marriage and that he lived off Donna. She confirmed that Barley had access to the PIN number to Donna's debit account and that the account was emptied through various withdrawals in the Houston area between the date her mother died and the date of Barley's interview. Yet Barley told the police officers that he had a job and had money to pay for his hotels and expenses while in Houston.

Further, Barley stated in his recorded interview that he continued to choke Donna for one to two minutes after she already dropped the weapon, that she was not doing anything to defend herself at this point because "there wasn't anything she could do," yet he did not stop. He continued to choke her "with all his might" until she was unconscious. And he never looked back. He left for three days, depleting her account, calling to check if there was a warrant for his arrest, then finally appearing at the police station with an explanation.

There is significant evidence of guilt, based on (1) Barley's own description of the events and his state of mind at the time, (2) the inconsistencies between Barley's statement and those of the witnesses as well as within Barley's statement itself, and (3) the impression Barley's hostile demeanor likely had on the jury where he showed apathy towards Donna's injuries and death instead of remorse. This factor weighs in favor of finding the evidentiary ruling to be harmless error.

c.      Character of erroneous evidence

The next factor we consider is the character of the erroneously admitted evidence and how it might be considered in connection with other evidence in the case.  The key issue in the trial was Barley's intent either to commit murder or to merely defend himself.  The challenged evidence of past convictions had no connection to Barley's intent.  Barley said in his statement that he had never hit or been violent to a woman before this incident.  Accordingly, it would have been unreasonable for the jury to presume a prior domestic violence conviction.  It is far more likely that, if the jury even wondered, it would have suspected drug convictions.  This is because Barley stated in the interview that he had a long history of drug use and that his two previous marriages ended, in part, because he used a lot of drugs and could not be the man of the house that was needed.  Also, he admitted he used crack cocaine often.

Because there is little connection between the extraneous evidence and the evidence that was the focus in the case—the facts surrounding Donna's death and Barley's state of mind—we hold that this factor supports a finding of harmless error.

d.      Whether the State emphasized erroneously admitted evidence

The final factor is whether the State emphasized the error in closing argument or otherwise.  The State did not.  We find no indication in the record that any attorney or witness drew attention to Barley's statements about prison or made any reference to his past criminal record during the guilt-innocence phase of the trial.  This factor also favors a finding of harmless error.

We conclude, based on the record as a whole, that Barley's statements about prison—made more than half way through the audiotaped interview—did not have a substantial effect on the jury's determination.  Instead, we believe they had no more than a slight effect.  Accordingly, we hold that the error in admitting the evidence was harmless.

*Id.* at 10–19 (citations, footnotes omitted).

The admission of inadmissible evidence for purposes of federal habeas relief is governed by *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  In *Brecht*, the Supreme Court

addressed the issue of harmless error in the context of federal habeas review and determined that a habeas petitioner is not entitled to habeas relief based on trial error unless he can establish that it resulted in actual prejudice.  507 U.S. at 637.  "Actual prejudice" involves a determination of whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Id.*  In making that determination, the federal habeas court must review the entire record so as to fully consider all the ways in which the complained-of error could have infected the course of the trial.  *Cupit v. Whitley*, 28 F.3d 532, 538 (5th Cir. 1994).

The Court has carefully reviewed the record and the arguments, and finds no fault with the intermediate state court's analysis and determination that the inadmissible evidence did not have a substantial effect on the jury's verdict.  In applying the *Brecht* standard to the evidentiary error, the Court finds that petitioner fails to show actual prejudice.  As noted by the intermediate state appellate court and as shown by the record, petitioner admitted to choking complainant until she lost consciousness even after she had dropped the machete, then deliberately fleeing the scene without calling for medical help or checking on her.  He initially failed to answer police investigator's questions as to why he had continued choking her after "there wasn't anything she could do," and gave no explanation as to why he did not simply leave the house when the opportunity arose.  Later during the police interview, petitioner stated, "I was pissed.  I've got a button.  If you push it the wrong way, I am going to respond.  I can't help it.  I'm not going to let anyone push me the wrong way."  Petitioner

33

made no contact with family until days after the incident, and called the police only after learning of complainant's death to see if there was a warrant for his arrest. The State made no reference to petitioner's criminal history during guilt-innocence, nor did it take advantage of the complained-of evidence during trial. Petitioner's own recorded statement refuted his claim of acting in self-defense, and strongly suggested that he had strangled complainant in anger and felt no remorse for her death.

Petitioner fails to show actual prejudice under *Brecht*, and habeas relief is unwarranted. Respondent is entitled to summary judgment dismissal of this claim.

### *Ineffective Assistance of Appellate Counsel*

Persons convicted of a crime are entitled to effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). This Court reviews counsel's appellate performance under the *Strickland* standards. *See Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1998). Petitioner must allege and present facts showing that his appellate counsel's representation was deficient and that the deficient performance caused him prejudice. That is, petitioner must show that, but for appellate counsel's deficient performance, the outcome of the appeal would have been different. *See Strickland*, 466 U.S. at 687–88, 692; *Jones v. Jones*, 163 F.3d 285, 300 (5th Cir. 1998). Effective assistance of appellate counsel does not mean that counsel will raise every available non-frivolous ground for appeal. *Evitts*, 469 U.S. at 394. Nor will counsel be deficient for failing to press a frivolous point. Rather, it means, as it does at trial, that counsel performs in a reasonably effective manner. *Evitts*, 469

U.S. at 394.  A reasonable attorney has an obligation to research relevant facts and law and make informed decisions as to whether avenues will, or will not, prove fruitful.  *Strickland*, 466 U.S. at 690–91.

Petitioner asserts that appellate counsel was ineffective in failing to raise the issues petitioner has raised in this habeas petition.  The Court has found no merit to any of the claims raised by petitioner in this proceeding, and appellate counsel was not ineffective in failing to raise those groundless claims.  *See Jones v. Barnes*, 463 U.S. 745, 754 (1983) (holding as well established law that appellate counsel need not raise every non-frivolous issue on appeal).  No basis for habeas relief is shown, and respondent is entitled to summary judgment on the issue of ineffective assistance of appellate counsel.

### *Conclusion*

Respondent's motion for summary judgment (Docket Entry No. 8) is GRANTED.  The petition for a writ of habeas corpus is DENIED and this lawsuit is DISMISSED WITH PREJUDICE.  A certificate of appealability is DENIED.  Any and all pending motions are DENIED AS MOOT.

Signed at Houston, Texas on February 25, 2016.

Gray H. Miller
United States District Judge

35